IRVINE J. KITTINGER, Suing on Behalf of Himself and All Other Stockholders of CHURCHILL EVANGELISTIC ASSOCIATION, INC., Who Shall Contribute to the Expense of This Action, Plaintiff, *v.* CLINTON H. CHURCHILL and Others, Impleaded with CHURCHILL TABERNACLE and CHURCHILL EVANGELISTIC ASSOCIATION, INC., Defendants.*

Supreme Court, Special Term, Erie County, May 4, 1936.

* Affd. on this opinion, 249 App. Div. 703. See, also, *Kittinger* v. *Churchill Evangelistic Assn., Inc.* (151 Misc. 350; affd., 244 App. Div. 876; 153 Misc. 880; affd., 244 App. Div. 877). See, also, 239 App. Div. 253; 245 id. 805.

4

*F. Paul Norton*, for the plaintiff.

*Coatsworth & Diebold* [*Charles Diebold, Jr.*, and *Ralph K. Robertson* of counsel], for the defendants.

LARKIN, J.   The action is brought by plaintiff, as a stockholder of the defendant Churchill Evangelistic Association, Inc., suing on behalf of himself and all other stockholders who will contribute to the expense of the action, for the purpose of setting aside the transfer of property of the association, a stock corporation, to defendant Churchill Tabernacle, a religious corporation.   All of the individual defendants were and now are directors of the association.   Defendants Thomas, Doherty, Werner, Waters, Fiedner, Rogers and Schilke are also the trustees of the Churchill Tabernacle.

The basic facts out of which the present controversy grows, and upon which this case must be adjudicated, are as follows: In the year 1917 Rev. William H. (Billy) Sunday conducted an evangelistic campaign in the city of Buffalo.   Defendant, now the Rev. Clinton H. Churchill, became a convert, and from thenceforth has devoted his efforts to religious work.   Immediately after the close of the Sunday campaign he became a student for the ministry of the

Methodist Episcopal church, and subsequently was regularly ordained as one of its ministers. His bishop desired him to engage in evangelistic work exclusively for the Methodist Episcopal church. The Rev. Mr. Churchill believed that he could work more effectively as an evangelist if his efforts were not confined to any particular sect. With the approval of his bishop, he was authorized to engage in evangelistic work of an undenominational character. In the meantime a considerable number of people had become interested in this idea. In this group were plaintiff and defendant Richard Werner, an attorney. A considerable number of the group met at Mr. Werner's office and discussed the best way in which the Rev. Churchill's ideas of religious activity could be carried out. It was finally determined that it could best be done through the medium of a corporation. The only reason for incorporating was to relieve from individual liability for obligations which might be incurred in the carrying on of the work to be done. Mr. Werner was directed to prepare a certificate of incorporation. It was clearly the idea in the minds of all that this corporation should not, in any way, be a source of profit to any of those interested in it. As a result of this conference Mr. Werner prepared a certificate of incorporation as a stock corporation, drawn in conformity to the, then, Business Corporations Law of this State. This certificate was suitable, only, for a stock corporation organized for profit. The original certificate, as prepared and signed, contained provisions in it which showed clearly it was not a stock corporation. When it was presented at the office of the Secretary of State, filing of it was refused, because of the fact, patent from the face of the instrument, that it was not a stock corporation. A suggestion was then made by that office to Mr. Werner that the certificate be changed, and that the real character of the incorporation be shown through its by-laws. This suggestion was accepted and an amended certificate, as a stock corporation, prepared and filed, which eliminated from the face of it any statements which showed the actual intent of the incorporators. The signers of the certificate were the Rev. Churchill, his wife and plaintiff. Each subscribed for one share of stock. Its authorized capital was 100 shares of $100 each. Its name was Churchill Evangelistic Association, Inc.

Following the incorporation a meeting of the incorporators, together with other members of the group, was held. The question of issuing stock arose and was discussed. It was finally determined by those attending that all of the stock should be issued to the three incorporators, fifty shares to plaintiff, forty-nine shares to the Rev. Churchill and one share to his wife. The idea which influenced this stock distribution was that the two most active members of

the organization were plaintiff and the Rev. Churchill.   It is clear that no one there had in mind that, by reason of its issuance, the holders of it became the owners of the corporation.   On the contrary, the object in doing so was simply to vest in these three management of the affairs of the corporation in order that the ideas, to advance which it had been organized, could be more effectively carried out.   Nothing was paid for the stock, and as a matter of fact, at the time of its organization, and for some period thereafter, the corporation had no assets.   It never was the thought that anything should be paid for the stock, because it was not to be a source of profit.   At the same time the stockholders adopted by-laws, of which the following are important:

" Surplus.   § 1.   Any and all surplus after the actual operating expenses have been paid is to be set apart each year to create a fund for the promotion of evangelistic and religious work, and to perpetuate such work.

" § 2.   It being particularly understood that no dividends are to be paid or division of profit to be made out of any money received by the corporation."

In order to effectuate, further, the fact that the stock, itself, was valueless to the nominal holders thereof, while these certificates were filled out, they were never torn from the book in which they were printed, but, on the contrary, remained in Mr. Werner's possession, and have never passed into the hands of the individuals named as stockholders.

Although plaintiff, the same as many others, had contributed money to further the Rev. Churchill's work, and after the incorporation made similar contributions, he evidently did not consider these contributions, in any sense, as furnishing a consideration for the issuance of the stock to him.   On the trial of this action plaintiff was not sworn, but defendants offered in evidence, as admissions against him, testimony which he gave upon the trial of a previous action for a declaratory judgment, in which he was plaintiff and many of the present defendants were such therein.   The following excerpt from that testimony is pertinent upon the question of the payment of consideration for the stock: " Q. When the stock was issued to you was there any payment made by you of any kind in the nature of a consideration for the issuance of the stock?   A. No money actually paid.   Money had been put in.   Q. You mean you had made contributions?   A. Yes.   Q. Same as other people had?   A. Yes.   Q. Is that right?   A. Yes.   Q. Do you know how the stock actually happened to be issued in your name?   A. Well, I don't know."

As a matter of fact at no time has plaintiff made any claim that he actually paid any consideration for his stock, provided his contributions for the advancement of the Rev. Churchill's work cannot be treated as a payment. The proof indicates that the total amount of money which the association received from all sources, from the time of its organization to the fall of 1934, was between $800,000 and $900,000. The bulk of this money was received from those interested in the movement. Plaintiff was a fairly liberal contributor, but as such a contributor he stands in no better position to claim ownership of the stock than do scores of others who made similar donations. The present properties of the church can, in no sense, be said to be a trust fund created by this plaintiff. The association's ownership of them did not become possible through large contributions, but rather through the mites of many. Thousands of people who have attended the religious services of this association during the past years have contributed their money toward the work, just the same as plaintiff did. His contributions were, in every sense, voluntary. He never considered them in any other way, nor as creating a trust fund, any more than did those who made Sunday offerings. He is in no position, now, to claim his voluntary contributions shall be treated as a consideration for the issuance of the association's stock to him. No other finding is permissible than that there never has been any consideration paid for the issuance of the 100 shares of stock of the evangelistic association. This finding is important in this litigation, because it must be borne in mind that plaintiff's rights are predicated on his claim of so-called ownership of stock in a stock corporation.

After its incorporation the work of the association was confined, as it had been previously, principally, to the evangelistic efforts of the Rev. Churchill, who conducted campaigns in and about Buffalo. It had no real property, or other assets. At first it had desk room in Mr. Kittinger's factory. Later it moved into an office in the Calumet Building on Chippewa street. Subsequently it acquired property at the corner of Lafayette avenue and Grant street, where its first church edifice, called the "Tabernacle," was built. Thereafter the society acquired the location on Main street near Utica, whereon was built the large tabernacle which now houses its work. There, today, this association, or its successor, Churchill Tabernacle, functions in every way the same as every other Christian church. It holds regular church services, has a Sunday school, administers the sacraments, conducts funerals, and, generally, does every work which all other Christian churches do.

As a further evidence of the character of this organization, and how plaintiff looked upon it, a voting trust agreement, executed on

November 5, 1924, by plaintiff and the Rev. Churchill and his wife, is quite important. Apparently for the purpose of emphasizing further the fact that no beneficial interest had been created in any of the stockholders, by the issuance of stock to them, the so-called trust agreement which gave rise to the previous litigation between some of the parties hereto was executed. In the preamble are the following recitals:

"WHEREAS, The Churchill Evangelistic Association, Inc., is organized for the purpose of promoting evangelistic work and to further the preaching of the Gospel; and

"WHEREAS, the parties of the first part acquired and held their stock only as trustees to further the work of the Association and not for their own private gain; and

"WHEREAS, it is the sense of the parties hereto that the Association will better accomplish its purpose if all its stock were placed in a formal voting trust with trustees devoted to the work."

Moreover, the whole scheme of the voting trust is highly significant. It evidences, clearly, a purpose, effectually, to tie up, indefinitely, this stock so that the individuals, in whose name it stood, could in no manner, acquire any benefits by reason of their record ownership, nor interfere in any way with the progress of the religious idea which the organization sought to foster. It was this attempt to tie up the stock that caused the courts, when called upon to construe it, to hold that it was valid for ten years only.

From 1924 until 1930 the relations between the defendant Clinton H. Churchill and plaintiff remained harmonious. The religious influence of the association and its standing as a church increased rapidly under the former's guidance. He was one of the first clergymen of the country to appreciate the importance of the radio as an adjunct to religious work. In the beginning the association leased time. Subsequently, with the consent of the Federal authorities, station WKBW, the association's own radio station, was established. For a time this station was operated for religious work only. Subsequently the Federal Radio Commission adopted a requirement that licensed radio stations should be utilized not less than sixteen hours a day. Clearly, this organization could not use all this time every day in the week for religious services exclusively. It could only be utilized by entering the commercial broadcasting field. In order, then, to retain the use of station WKBW for the religious work of the association, Messrs. Churchill, Kittinger and Hiram W. Deyo, who were at that time the voting trustees of the association stock, organized a stock corporation known as the Buffalo Broadcasting Corporation, in no way con-

nected with the association. The latter's rights in the radio station were transferred to it under a contract whereby time for religious services was reserved to the association, and in addition, the broadcasting corporation was required to pay, annually thereafter, substantial sums, in the way of payment for the rights transferred. Seemingly, the relations arising through the incorporation of the Buffalo Broadcasting Corporation, and also its contract with the association, gave rise to differences between plaintiff and the Rev. Churchill early in 1930. The letters plaintiff then wrote, and his subsequent conduct, became important factors in the disposition of this litigation. Under date of February twenty-first, plaintiff wrote the following letter:

" CHURCHILL EVANGELISTIC ASSOCIATION
1420 Main Street
Buffalo, N. Y.

" GENTLEMEN: I wish to herewith tender my resignation as treasurer and trustee of the Churchill Evangelistic Association, feeling that the affairs of this body should be in the hands of some one who can take a more active part in the growing business demands of this Association and be in closer touch with the management.

" Very truly yours,
" IRVINE J. KITTINGER."

Apparently his other associates in the work did not wish him to resign. On February 25, 1930, plaintiff wrote another letter, of which, in so far as its contents are pertinent to this lawsuit, the following is a copy:

" DEAR CLINTON: * * * as I mentioned to you last week I felt it would be better for all if I severed my connection with the Tabernacle entirely and since that time I have thought it through in every way and have not changed my decision. This does not mean that I am not interested in what you are doing and accomplishing for I am and want to continue to support your work, but I have made up my mind it would be best for all when I am eliminated.

" We all have explicit confidence in Mr. Charles Diebold, Jr., and shall suggest he be put in my place, as I mentioned to him, as well as Mr. Deyo when he was here Saturday.

" There is no reason why publicity should be given this matter right at this time in view of the Broadcast Company's changes, and it would be agreeable to me to have acceptance of this resignation deferred for a month if you think advisable. As long as I am connected with the B. B. C. I can assure you of my fullest cooperation.

" Sincerely yours,
" IRVINE J. KITTINGER."

In compliance with plaintiff's suggestion, that action upon this resignation be deferred, nothing was done by the association. On April 21, 1930, plaintiff wrote another letter, which is as follows:
"Rev. CLINTON H. CHURCHILL
Churchill Tabernacle
1420 Main Street
Buffalo, N. Y.

" MY DEAR SIR: I was surprised when reading your notice in yesterday's Sunday Courier-Express to see that you had used my name as treasurer as well as director of the Churchill Association. In doing this I feel that you overstepped yourself inasmuch as my resignation has been in your hands nearly two months. I have on several occasions thru Mr. Deyo requested that this be acted upon. Kindly see that action is taken without further delay. Also refrain from using my name, as being connected with the Churchill Association. Otherwise I will be obliged to issue a statement, which I would regret to do.

" Very truly yours,
" IRVINE J. KITTINGER."

Upon receipt of this the association acted, and under date of April twenty-fifth, plaintiff was notified that his resignation as treasurer and trustee of the organization had been presented and accepted. The tone of plaintiff's last letter is significant. His previous communications were conciliatory. His last letter, however, was most peremptory. He demanded action from the association. He evidenced an intention to wash his hands of it. Not only that, but his subsequent conduct warrants this conclusion. From that time on he, in no way, participated, or manifested any friendly interest in any of its affairs. He no longer attended its services. He became engaged in litigation in various matters, in which his interests were rather bitterly opposed to those of the association. His letters and his subsequent actions lead to but one conclusion, namely, that he intended, absolutely, to withdraw and sever all connection with the association or the tabernacle. Viewing him then as a church member, plaintiff must be held to have voluntarily withdrawn, and by his own act, to have excommunicated himself, so to speak, from the fold. Standing as he did, in the position of a holder of its stock as trustee for the benefit of the association, as a voting trustee, and as a director, he must be held to have relinquished them all. He put himself outside the group as effectually as if he had never been a member of it. He no longer had any standing, either as a member of the church, or as one interested in its property and temporalities, because of his record ownership of stock.

Although in April, 1930, plaintiff's successor, as voting trustee and director, was named, and this successor acted in his place and stead thereafter, Mr. Kittinger did nothing to indicate but that he was entirely satisfied and through with the evangelistic association, both as a member and officer, until 1933. In that year he began an action for a declaratory judgment, to the effect that the voting trust was invalid, or, if valid, that he had not resigned as a voting trustee, but merely as a director. The suit was tried, and resulted in a judgment which declared the trust invalid at the expiration of the first ten years, namely, November 5, 1934, but that plaintiff had resigned as a voting trustee, as well as a director. The judgment further provided that at the expiration of the ten-year period, November 5, 1934, a certificate of stock for fifty shares be issued to him, forty-nine shares to the Rev. Churchill, and 1 share to the estate of the latter's deceased wife. The voting trustees, at the time this judgment was entered, were the Rev. Churchill, his father, D. F. Churchill, and Hiram W. Deyo. The trust agreement provided, in substance, that two of the trustees could act for all. Shortly before November 5, 1934, the directors of the association caused a religious society, known as the Churchill Tabernacle, a defendant herein, to be incorporated as a free church under the Religious Corporations Law. Seven of the then directors of the association were named as its first trustees. All of the property and assets of the association were transferred to the tabernacle, subject to the obligations of the association. The Messrs. Churchill, as voting trustees, transferred to the tabernacle all of the stock of the association. At the present time the defendant Churchill Tabernacle, a religious corporation, owns all of the property formerly owned by the Churchill Evangelistic Association, Inc., and all of the capital stock. Other than this change of record ownership there has been no actual change in the character of the work which was being done prior to November 5, 1934, by the association. Its properties and temporalities are now being used by the tabernacle in the same manner and for the same purposes as it used them.

Immediately upon this action by the association and the voting trustees the present suit was begun by plaintiff, who, in substance, alleges that these transfers virtually worked a dissolution of the Churchill Evangelistic Association, Inc., and that the voting trust agreement signed by him never contemplated any authority, on the part of the voting trustees, to do so. Plaintiff contends, further, that what they and the directors did, was to sell all the property and assets of a stock corporation without his consent, as

the owner of fifty per cent of its stock, in contravention of the Stock Corporation Law of this State.

In the defendants' answer herein the affirmative defense, which is also labeled a counterclaim, presents the only issue, namely, has the plaintiff standing to maintain this action? At the threshold of this determination is the question of whether or not the adjudication in the prior action, for a declaratory judgment, does not estop these defendants to make this defense.

At first blush it would seem that the adjudication in the declaratory judgment action presents all of the features of an estoppel precluding the defense which has been interposed in the present suit. It is difficult to see how Mr. Kittinger was entitled to maintain an action for a declaratory judgment in reference to the voting trust, unless he had some interest in the stock. Yet an examination of the record therein discloses that the defendants did endeavor to present the question as to the actuality of plaintiff's ownership, but the court declined to make any findings requested by them, and which had for their purpose establishing the lack of capacity of plaintiff to maintain that suit. The court's action was predicated on the fact that such an issue was immaterial to the one to be decided. In that sense the issue here presented has really never been determined. Since the facts therein, and herein, clearly show an utter absence of any ownership in favor of the plaintiff in the association's stock, it would be carrying the doctrine of estoppel by judgment to a point where it might be said to be working an injustice, if it were applied here.

Moreover, this position on the part of plaintiff seems foreclosed by the memoranda of the Appellate Division on the affirmance of the judgment in the declaratory judgment action (244 App. Div. 876), when the court stated: " In affirming this judgment, we do not interpret it as constituting an adjudication of the character of stock ownership by the plaintiff, the defendant Clinton H. Churchill, or the representatives of Sarah H. Churchill, in the Churchill Evangelistic Association, Inc." And, again, on denying defendants' motion for a reargument and leave to appeal to the Court of Appeals (245 App. Div. 845), when the court again declared: " With the decision heretofore rendered in this case (244 App. Div. 876), we filed a memorandum in which we stated in effect that in affirming this judgment we did not interpret it as constituting an adjudication of the character of the stock ownership by the plaintiff, by the defendant Clinton H. Churchill, or by the representatives of Sarah H. Churchill, in the Churchill Evangelistic Association, Inc. The *sole* question involved was the *interpretation of a voting trust agreement*. The plaintiff Kittinger and defendant

Clinton H. Churchill and Sarah H. Churchill signed the voting trust agreement and their signatures gave validity thereto. For the purpose of construing that instrument we must hold that its validity depended upon the ownership of the stock by those signing the agreement. *In this sense, and in this sense only*, was it material in this case whether or not the persons who signed the agreement were owners. But the quality of the ownership, whether they held individually, that is, of their own private right, or as trustees or subject to certain disclosed or undisclosed equities, is entirely immaterial, and the judgment affirmed cannot purport *to decide anything except as to the validity and construction of the voting trust agreement.*" (Italics mine.)

Giving full effect to the language of these two decisions, the conclusion is inescapable that the prior judgment does not operate to bar the defendants from asserting and establishing that the plaintiff has no standing to maintain the present action.

With the defense of *res adjudicata* eliminated, the determination of this case resolves itself into two questions:

1. Can a court of equity look through the corporate structure of the association, and if it determines that it is really not a stock corporation, but merely an association or a religious society, adjudicate plaintiff's rights as a member of such a group? And,

2. Even assuming that the association must be treated as a stock corporation, has the plaintiff any rights in the stock issued to him, which entitle him to maintain this representative action?

Although the Churchill Evangelistic Association, Inc., has the form of a stock trading corporation, it is patent that it is not, but is a religious society. The evidence justifies no conclusion but that it was organized and has been conducted at all times as such. To speak of it as a stock corporation is a misnomer. The essential element of a New York stock corporation is profit. No such thought was ever in the minds of the incorporators, or those who have conducted its affairs since its inception. It is incongruous, therefore, to refer to it as a stock corporation. Merely because it has been brought into existence as a stock or profit corporation does not preclude a court of equity from looking through the structure and determining what it actually is. It is a maxim of equity that it regards substance rather than form, and that it will never suffer the mere appearance and external form to conceal the true purpose, objects and consequences of transactions. Form is relatively less important in the equitable than in the legal tribunal, a truth which finds concrete exemplification in the treatment, by equity, of corporations. Equity, to accomplish its preventive acts, frequently views the corporation as an aggregation of individuals

whose ultimate rights cannot always be preserved by respecting the entity theory. It is, therefore, free, unless restricted by some counter equity or principle of law, to look behind the corporate screen. The artificial entity may be disregarded in a court of equity, whenever its existence is invoked for a reason foreign to the purpose of its existence.

These are elementary principles of equitable jurisdiction. They can well be applied to the present situation. Plaintiff insists, in this action, that he is the owner of one-half of the capital stock of a business corporation. It is clear that, thereby, he invokes his stock ownership in the corporation, for a reason foreign to the purpose of its existence. It is incredible that the original group, through whose efforts this organization came into being, ever contemplated, because fifty shares of the capital stock were issued to plaintiff, that he, thereby, became the owner of one-half of its capital stock, and, thus, legally entitled, on a dissolution of that corporation, after the payment of its debts, to one-half of its property. Such an idea is completely repugnant to the very purpose for which it was organized. It is appalling as applicable to a church. To permit this corporate structure to be thus used would be to work a fraud upon all the other organizers, save Mr. and Mrs. Churchill, and upon the thousands of sincere people who have built it up, and who, by their contributions, large and small, have enabled it to accumulate the property which it now possesses. A court of equity is not so shackled that, because of mere form, it must treat plaintiff's rights in the association as those of a stockholder in a trading company. It may view the association as it was intended to be, and actually is, a religious society. Plaintiff never had any rights in it other than those possessed by any member of such an organization. The stock itself gave him no rights whatever. He had no individual right to it, except a right common to all the members of the society. His associates merely constituted him and the other two stockholders its first trustees. When he resigned as trustee he ceased to have any representative capacity for the others. He no longer had any voice in its affairs different from that of any member who affiliated with it and contributed to its support. When he completely severed his connection with the organization, ceased to contribute to its support, and arrayed himself in hostility to it, he then became no different than a member of any church who withdraws from it or is excommunicated. Had he remained a trustee, even though he was no longer in sympathy with the society, he might have had standing to maintain an action similar in character to the present. (*Baptist Church in Hartford* v. *Witherell*, 3 Paige, 296.) But having severed all connection,

not only with the corporate body, if there be such, but with the church itself, he has no footing to maintain the present action. (*Nance* v. *Busby*, 91 Tenn. 303; 18 S. W. 874.) The usual rule applicable to religious societies is that the rights of a member are dependent on the continuance of his membership, and when he ceases to be a member his rights and beneficial interest in the society's property cease, and he no longer has standing to sue in relation thereto. (54 C. J., Religious Societies, § 29; *Nance* v. *Busby, supra; St. John's Church* v. *Hanns*, 31 Penn. St. 9; *Shannon* v. *Frost*, 3 B. Mon. [Ky.] 253.) The same result accrues if the organization be treated as a voluntary association. (5 C. J., Associations, §§ 86, 87.)

Nor does the fact that plaintiff may have made contributions to this association give him any right, after his withdrawal, to sue in relation to its affairs. As long as he remained a member he had an absolute right to have the property and funds of the association administered according to its plan, and he was entitled to participate in its affairs. But once he withdrew he lost that right, because his contributions were purely voluntary. They were not impressed with any trust, express or implied. The most that can be said is, that they were contributed with the understanding that they be used for undenominational religious purposes. They are now being so used.

Moreover, since the complaint, herein, is clearly bottomed upon the proposition that plaintiff is the owner of one-half of the capital stock of a stock, or profit corporation, if plaintiff is not actually the owner of this stock, he has no standing to bring this action. (*Berger* v. *National Architects' Bronze Co.*, 173 App. Div. 680, 682, 683.) His rights as such a stockholder are governed by the Stock Corporation Law of this State. Section 69 of that statute provides that no corporation shall issue its shares of stock except for money, labor done, or property actually received for the use and lawful purposes of such corporation. No one reading this record can reach any other conclusion but that the total authorized capital of the Churchill Evangelistic Association, Inc., was issued to Messrs. Kittinger, Churchill and Mrs. Churchill absolutely without consideration. The corporation received nothing for it. True, they had undoubtedly made contributions to further the religious activities of Mr. Churchill, and it is undoubtedly true that after the incorporation they made similar contributions to the corporation itself. However, these contributions were no different than the offerings of thousands who have attended the services in this tabernacle. They were never intended by them to represent payment for the stock. Those who brought the corporation into being never had any

thought that the stock should be paid for in the manner provided by section 69, *supra*. It never has been done. The stock was issued without any consideration whatsoever. A stock corporation cannot lawfully do this.

While stock issued in violation of this section is not void, and in the hands of *bona fide* holders, for value, may confer rights on them as stockholders, in the hands of the original holder it is valueless. (*B. & C. Electrical Construction Co.* v. *Owen,* 176 App. Div. 399; affd., 227 N. Y. 569.) As stated in the opinion of the Appellate Division in that case, the certificate for such stock was, in effect, like so much blank paper. In *Sickles* v. *Morton* (8 N. Y. St. Repr. 433; reptd. by mem. only, 44 Hun, 623) Presiding Justice VAN BRUNT, in an opinion, in which Justices WILLARD BARTLETT and MACOMBER concur, says, of shares of stock issued without consideration: " These shares being issued entirely without consideration were void unless they became the property of a third party without notice. As far as the Mortons were concerned they could assert no right because of their ownership of these illegal shares." Therefore, even if the first premise of this decision be faulty, and the association must be considered a stock corporation, plaintiff cannot maintain a stockholder's representative action, because he has no rights in the stock, as such.

From the foregoing it is clear that plaintiff, under his present pleading and proof, has shown no such interest in the affairs or property of the Churchill Evangelistic Association, Inc., as authorizes a court, at his instigation, in interfering with *its* actions. The complaint must, therefore, be dismissed, with costs. The result is equitable. A situation is not disclosed, of trust funds impressed with a specific or implied trust, being diverted contrary to the intention of the donors. The most that can be said, of the contributions which have made the holdings of the evangelistic association ·possible, is, that they were given upon the understanding that they were to be used for religious purposes of an undenominational character. The funds were vested in a corporation, the basic idea of which is profit, as trustee. Such a trustee is incongruous when it is considered that the property is to be used to maintain a church, and that this same trust fund is to be increased by the contributions of those attending or in sympathy with that church. Moreover, the litigation which the association has found itself in for the past few years must, of necessity, have hampered it in the doing of religious work. People would be inclined to look with suspicion upon a corporation, organized on the theory of profit, conducting a church. All that has really been done has been to change the character of the trustee to a corporation — a religious

one — which is more in keeping with the objects for which the contributions have been made. Indeed, it would seem that the courts would have had power, at the suit of the association, to have canceled the outstanding stock and to have permitted it to do exactly what it has done, upon the theory that the contributions made to the association constituted a charitable trust, and that the vehicle through which the trust was being administered was unsuitable. While not strictly an application of the *cy-pres* doctrine, it would not have been extending it very far. Viewed in that light, it is difficult to see any real cause for complaint of the action taken by the association and its officers, in creating a new trustee, a religious corporation, affiliated with no denomination, and transferring the properties of the association to that religious society, to be administered by it, in exactly the same manner as the association did.

Decision may be prepared in accordance with this memorandum.