OPINION OF THE COURT
Martin Evans, J.
This action by congregants to set aside the sale of a synagogue by its purported trustees was tried before this court. Not only has it raised significant legal issues of standing, and governance of religious organizations, it has slightly opened a window on some of the forces which have shaped our city.
FACTUAL BACKGROUND AND PRIOR PROCEEDINGS[1]
In 1871, a corporation was formed, known as “Congregation Chebra Ukadisha Bnai Israel Mikalwarie”. In English translation, its Hebrew title means, “Congregation and Mutual Aid Society of the Sons of Israel from Kalwarie.” The entity is a product of the Eastern European immigration of the mid-nineteenth century. The background of its formation is in doubt (cf. Eisenstein, History of the First Russian American Jewish Historical Society, p 68 [1901] ; Grinstein, Rise of the Jewish Community of New York [Philadelphia: Jewish Pub Soc (1947) ], pp 474-477; Wolfe and Fine, Synagogues of New York’s Lower East Side *908 [New York: Washington News Press-New York University Press (1978)]), even as to which village Kalwarie (Calvary) was the original home of the founders. There were two such once predominantly Jewish Polish villages: one in Galicia near the pre-World War I Russian-Austrian border, and one near Lithuania.
The corporation was incorporated not as a religious corporation, but as a mutual benefit society. Its purposes were to visit and pay benefits to sick members and to bury their dead, with the appropriate rites of Orthodox Judaism.
The property at issue, on Pike Street near East Broadway, was acquired by the corporation in 1882. According to an application for a tax exemption filed in 1883, the corporation was already using it as a synagogue.
There is no evidence as to where burials were made prior to 1897. In that year the corporation purchased cemetery lots from the Acacia Cemetery Association, which had been incorporated in 1896 by other persons. The corporation’s plots represent about one eighth of the cemetery lands.
The present building was completed in 1903. The new “Pike Street Synagogue”, or “Kalwarier Shul”, was one of the largest and most beautiful synagogues of the Lower East Side. (See, e.g., Wolfe and Fine, Synagogues of New York’s Lower East Side [New York: Washington News Press-New York University Press (1978) ], p 90 et seq.)
Although there are neither by-laws, membership lists nor records extant, and no members of the corporation still living, there appears to have been a succession of trustees. In 1944, a Mr. Agress, the then president, asked the defendant Gulker to serve as secretary and trustee. Gulker, then a 33-year-old accountant, has since received approximately $250 annually for keeping the financial records and looking after the building’s maintenance.
Although Acacia was entirely independent of the corporation when it was formed, at some time prior to 1944 the same persons became the trustees of both. Gulker believed, at the time he was asked to act as trustee of the corporation, that it was a religious corporation which owned the entire cemetery, although separate checkbooks were still main *909 tained. The trustees conducted synagogue and cemetery business informally, often by telephone, and agreed upon who was to serve as officers. About 1974, Gulker, the last surviving trustee, assumed the office of president.
For the past two decades, there have been no living members of the corporation. Worshippers desiring to join the congregation were told that memberships were not being accepted.
The building has been maintained by caretakers with moneys supplied by the trustees. Operating expenses approximated $30,000, while donations amounted to at most $1,800 annually in the past few years. The difference was supplied by Acacia, which the trustees treated as wholly owned by the corporation.
Attendance dwindled from 1,000 daily worshippers in its heyday, to a handful of primarily elderly people attending weekly services in 1978. For the last several years there was no full-time clergy, except on high holy days; services were conducted by congregants.
The synagogue’s physical condition deteriorated. Most of the plumbing is nonfunctional, many of the windows are broken, the roof seriously leaks, and the wiring, light fixtures and heating plant are inadequate. Repairs may cost as much as $350,000.
In 1977, Gulker decided that the building should be sold. He negotiated with the Eastern Buddhist Association, a religious corporation of the Buddhist faith with about 300 members residing in the nearby Chinatown community, and entered into a contract of sale for $180,000.
At an informal meeting in January, 1979, in order to bring the number of trustees to three, Gulker appointed his attorney, Seymour Shyman, and one Saul Goldstein as trustees. The three then approved the contract, which was not with the Eastern Buddhist Association, but with one Jeffrey Goldstein, son of Saul Goldstein, who without consideration assigned his rights to the Buddhist association; Gulker believed that Jewish tradition prevented the direct sale of a synagogue to another faith. Shyman and the Messrs. Goldstein had no other connection with the congregation.
*910 Gulker and his attorney, apparently acting under the belief that the corporation had been formed under the Religious Corporations Law, moved ex parte for approval of the sale, which was granted on January 24, 1979 (Stecher, J.).
Closing of title took place on August 28, 1979, after the Torahs and ritual objects were removed, and the building closed.
The congregants were unaware that they would no longer have a place in which to worship until the building was closed. They then commenced this action together with the United Jewish Council of the Lower East Side, which was subsequently removed as a party as being without standing.
At issue is the standing of the individual plaintiffs; the validity of the trustees’ resolution to sell, and of the ex parte order which approved the sale; and the right of the court to set aside the sale.
STATUS OF THE SYNAGOGUE AS A DE FACTO RELIGIOUS CORPORATION
The initial threshold question which the court must address is the legal status of the corporation and the law to be applied to it. Plaintiffs contend that, regardless of its formal organization, it has functioned primarily as a house of worship, and should be governed by the Religious Corporations Law. Defendants claim that, having been organized as a mutual benefit and burial society which incidentally conducted religious services, it should be governed by the Not-For-Profit Corporation Law, a successor to the statute under which it was organized.
From the beginning, part of the entity’s function was religious. It was the successor to several schisms and mergers of earlier synagogues and chemas, mutual aid groups organized by Eastern European Jewish immigrants, usually as Landsmanschaften (i.e., according to their towns of origin), for religious functions (e.g., obtaining a minyan for services), nonreligious functions (e.g., loans, legal advice and education) and quasi-religious functions (e.g., burial of the dead, visitation of the sick) which, although enjoyed as mitzvot (religious obligations under Jewish tra *911 dition), are not viewed as exclusively religious by contemporary secular society. It appears unlikely that those in control of the congregation engaged in such conceptual distinctions. (See Eisenstein, History of the First Russian American Jewish Community of New York [1901] ; Wolfe and Fine, Synagogues of New York’s Lower East Side [New York: Washington News Press-New York University Press (1978)].) The existence of unincorporated, predecessor religious organizations to the 1871 corporation is further supported by the seal used by the congregation, and affixed to the deed transferred herein, which reads “Congregation Sons of Israel, 1869”. Moreover, the inscriptions on the facade of the synagogue structure on Pike Street, of which the court takes notice, under the ancient documents exception to the hearsay rule, further support this conclusion. The inscription contains two Hebrew dates, corresponding to the Hebrew years equivalent to 1901-1902 (the known date of construction of the building) and 1861-1862.
The subsequent history of the congregation indicates that its function became primarily, and indeed, almost exclusively religious, and was so considered by its officers. As early as 1882 the congregation applied for a tax exemption, stating that the “property is used exclusively for religious purposes as a house of worship and dwelling of the synagogue employees.” In 1903, following erection of the new synagogue, one Hyman Sklamberg filed a similar exemption application as president, stating that the property at bar was owned by “Cong, kalvarier sons of Israel, a domestic corporation duly incorporated under the laws of this State for church purposes.”
In May, 1921, Sklamberg filed a certificate to correct the 1897 deed of cemetery plots from Acacia to the congregation. The certificate, which corrected the name of the grantee from “Congregation Sons of Israel of New York” to “Congregation and Chebra Ukadisha Bnai Israel Mikalwarie”, declared that the congregation “is a religious corporation, incorporated in March, 1871, pursuant to an Act passed April 5, 1813 [the predecessor of the current Religious Corporations Law].”
In 1950, the then president, one Isadore Rosenholz, filed *912 an affidavit stating that the congregation is “a religious corporation which maintains a synagogue at 15 Pike Street” with which he has been affiliated “for at least 60 years”.
In sum, whatever its obscure origins, and however one construes its -original functions as religious or otherwise, the congregation rather quickly metamorphosed into a de facto religious corporation. “[A religious] corporation may exist in fact without being legally constituted.” (Matter of Kaminsky, 251 App Div 132, 136, affd 277 NY 524; Matter of Lueken 97 Misc 2d 201.) In Kittinger v Churchill Evangelistic Assn. (161 Misc 3, affd 249 App Div 703), the court confronted a remarkably similar situation. A Methodist Episcopal church which functioned (supra, at p 8) “in every way the same as every other Christian church” had been organized under the Business Corporation Law, as a corporation whose stock was owned by three incorporators. The court held (supra, atpp 14-15): “Although the Churchill Evangelistic Association, Inc., has the form of a stock trading corporation, it is patent that it is not, but is a religious society * * * To speak of it as a stock corporation is a misnomer * * * Merely because it has been brought into existence as a stock or profit corporation does not preclude a court of equity from looking through the structure and determining what it actually is. It is a maxim of equity that it regards substance rather than form, and that it will never suffer the mere appearance and external form to conceal the true purpose, objects and consequences of transactions.”
The current Religious Corporations Law supports this view, and by its own terms is applicable to the instant situation where the entity has acted as a religious organization. Section 2-a, in pertinent part states: “This chapter [the Religious Corporations Law] applies * * * (b) to every corporation formed under any other statute or special act of this state which would, if it were to be formed currently under the laws of this state, be formed under this chapter”. That is to say, since the congregation has acted as a religious organization, and since, if unincorporated, it could now only be incorporated under the Religious Corporations Law, that statute is applicable to its governance.
*913 Not only has the congregation, certainly in recent years, acted exclusively as a synagogue, the individual defendants, the purported trustees, held it out to be a religious corporation. In so doing, others — including the congregants, contributors, the other defendants and indeed, this court— relied on their representations and their actions. First, contributions were regularly solicited and received for the upkeep of the synagogue, whether by Gulker, or by Kroth acting as his agent. Contributors were led to believe that they were supporting the maintenance of the synagogue as a functioning religious organization by helping to preserve the physical structure. Certainly none of the contributors believed they were contributing to the support of a memberless mutual benefit society, or a cemetery in which the congregation held a number of plots. It is thus anomalous that the trustees have, albeit in good faith, determined that the proceeds of the synagogue’s sale should be used not for any religious purpose, but for the support of the cemetery; it is ironic, since the cemetery is apparently self-sustaining, and the proceeds of some plot sales have been contributed to the synagogue.
Second, and equally significant, are the individual defendants’ actions in negotiating the synagogue’s sale and attempting to obtain court approval. It is indisputable that the individual defendants themselves believed that the synagogue is a religious corporation. The deed transferring title recites that the seller is a “Religious Association”. The title report prepared by defendant Chicago Title Insurance Company, declares that the seller is a “corporation formed under the Religious Corporation Law of the State of New York.” Defendants’ moving papers for the ex parte order approving the sale also refer to the petitioner seller as a “religious association”. (It is understood that the “religious association” is a religious corporation; otherwise, if unincorporated, it could not hold or convey title to real property; see Lougheed v Dykeman’s Baptist Church, 129 NY 211.) Moreover, the answering papers of the buyer and the title insurance company also indicate their assumption that the Religious Corporations Law, albeit different sections, interpreted differently, is applicable. At no time prior to this trial did any of the defendants challenge the *914 congregation’s status as a religious corporation, a position thoroughly inconsistent with their previous assumptions, positions and actions.
Two conclusions may thus be drawn from this situation. First, given the existence of a law (i.e., the Religious Corporations Law) under which the entity could have or should have been incorporated, the exercise by defendants of corporate prerogatives under the assumption that they were authorized to act for the entity under that law, and the effect of such actions on innocent third parties, a de facto religious corporation may be held to exist. (Methodist Episcopal Union Church v Pickett, 19 NY 482.) Second, having acted as if the congregation were a religious corporation, and thereby having caused others to detrimentally rely on that assumption, the individual defendants may be estopped from disproving during trial that position which they themselves had originally pleaded.
The Eastern Buddhist Association, purchaser of the property, was not misled into believing that the seller was anything other than a corporation formed under the Religious Corporations Law.
For all these reasons, the Religious Corporations Law is applicable to this sale.
STANDING
Having determined that the congregation should be regarded as a religious corporation, the court must consider a second threshold question: whether the individual plaintiffs, or any of them, has proved that they had the requisite standing under statute to bring the proceeding at bar. This question differs substantially from that affirmatively adjudicated by this court in a well-considered opinion (United Jewish Council v Congregation Chebra Ukadisha, Nov. 13, 1979, Stecher, J.).
Defendants there moved to dismiss, alleging, inter alla, plaintiffs’ lack of standing. The court held that the first-named plaintiff, the United Jewish Council of the Lower East Side, lacked standing as a matter of law, being merely a “concerned bystander” without an immediate, specific and tangible stake in the outcome. The court however rec *915 ognized that triable questions of fact existed regarding the standing of the individual plaintiffs. Thus, while they sufficiently demonstrated prima facie standing to proceed (i.e., standing in the general sense, of an actual stake in the outcome), the individual plaintiffs must still prove at trial' that they had the specific statutory qualifications entitling them to challenge the sale.
The statutory standard is embodied in sections 194 and 195 of the Religious Corporations Law, which define, in the absence of by-laws, those persons entitled to receive notice of, and vote at, meetings of Jewish religious corporations.
Although a religious corporation may otherwise determine the right to vote and the manner of voting, by adopting appropriate by-laws, the defendant purported congregation officers have been unable to produce any bylaws. Indeed, it is unclear to the court whether any by-laws had ever been duly adopted and followed by this congregation. It is clear, however, that in the absence of by-laws, the divestiture or encumbrance of real property belonging to a Jewish religious corporation must be approved by a majority vote at a congregational meeting. (Matter of Beth Israel, 114 Misc 582.)
Section 195 of the Religious Corporations Law, in pertinent part, reads as follows: “At a corporate meeting * * * the following persons, and no others, shall be qualified voters, to wit: All persons who are then members in good and regular standing of such church by admission into full communion or membership therewith in accordance with the rules and regulations thereof * * * or who have been stated attendants on devine worship in such church and have regularly contributed to the financial support thereof during the year next preceding such meeting”.
The evidence supports the individual plaintiffs’ claim of bona fide, actual and immediate interest in the future of the synagogue. They are, for the most part, earnest, dedicated congregants, motivated by genuine religious faith. Synagogue attendance in general and attendance at this synagogue in particular has played an important part in their lives. It is clear that for many of the plaintiffs, particularly the elderly, this synagogue has served as their social *916 and communal, as well as their religious center. They clearly have, in the traditional, general sense of standing, a “stake in the outcome”: they will be keenly affected by the result of this litigation. As use beneficiaries of the synagogue, their interest is as real as, albeit different from, any of the other parties.
The law, however, explicitly requires a greater showing. Since only two categories of individuals must be duly notified and permitted to vote at a meeting called to debate the sale of a synagogue, only such persons who could have collectively effected the sale, rather than those only affected by it, have standing. Those categories are (1) members and (2) regular congregants who also have been regular contributors.
The evidence discloses that the congregation has had no formal membership for approximately 15 years, since the death of the last dues-paying member; indeed, several plaintiffs testified that, having requested the opportunity to become congregation members, they were discouraged by defendant Gulker, and/or others, who informed them that no more members were being accepted.
Not being a member, is each individual plaintiff both a “stated attendant on divine worship” and a regular contributor to the synagogue, as required by law? Stated attendance has been held to mean regular attendance according to the customs and usages of the church in question, rather than occasional or sporadic visits. (People v Tuthill, 31 NY 550.) Although the custom and practice of Orthodox Judaism mandates the holding of daily services each morning and evening, diminished attendance in recent years has prevented the congregation from attaining, on a daily basis, a minyan (i.e., the quorum of 10 adult males required by Jewish tradition for the conduct of public worship). Consequently, the congregation scheduled regular evening and morning services on Sabbaths and holy days only. Under the circumstances, “stated attendance” must be defined as regular attendance at such services as are held according to the practice of the individual congregation. Moreover, it is clear that the Legislature, in providing in the Religious Corporations Law and its predecessors, for certain procedures for the governance of Jewish congregations, recog *917 nized the traditional self-governing organization of such congregations. It is thus consonant with that intent for the court to recognize the practices of each congregation as the standard for determining “stated attendance”. Most of the individual plaintiffs have demonstrated a consistent pattern of regular attendance at such services as were held in the year preceding the questioned sale.
The contribution requirement of the Religious Corporations Law must also be judged by the customs and practices of the denomination and the congregation itself. “The statute means the necessary, material support, without which the organization cannot exercise its ordinary functions, and perform its customary and appropriate duties and ministrations. It means, the parting with, and contribution of, a portion of one’s worldly substance, in the usual and customary way, to be used in meeting and defraying the expenses incurred by the church, congregation or society, in the support of public and divine worship” (People v Tuthill, supra, at p 561).
Although the requirement is neither as narrow as some defendants urge, nor as broad as claimed by some plaintiffs, the evidence nevertheless supports the individual plaintiffs’ claim of statutory standing. On the one hand, it is clear that mere attendance, regardless of how frequent, and indeed necessary to the maintenance of a minyan, the sine qua non for Orthodox Jewish public worship, is insufficient. Similarly, financial contribution to charity, even if under congregation sponsorship, and even if customarily solicited during the service and regarded as a religious obligation, does not meet the requirement — irrespective of the size or frequency of the contribution or the worthiness of the cause. Also legally insufficient, however laudable, is the rendering of an unsolicited, gratuitous service or the simple participation in ritual customarily regarded as a duty or an honor.
On the other hand, it is not necessary that the contribution be earmarked specifically and exclusively for the maintenance of the structure; neither must it amount to a major share of, or indeed, any specific proportion of the institution’s annual expenses; nor must it be paid according *918 to a weekly, monthly or any other given schedule, as long as it is rendered during the year preceding the congregational meeting. Certainly it is beyond the constitutional power of the State, whether through legislative enactment or judicial decision, to prescribe a mandated level of religious contribution; however, the court cannot be unmindful that since religious congregations, as all voluntary organizations, tend to reflect the economic circumstances of their congregants and their communities, levels of financial support may vary. The evidence indicates that the plaintiffs herein are generally of modest economic circumstances, perhaps to an even greater extent than that of the surrounding, remaining Jewish community. The customary level of contribution at this and other Lower East Side synagogues is lower than that of more affluent congregations in more prosperous communities. Frequently, contributions are in the amount of $18, or multiples thereof. (The ancient Hebrew numerical system employs the letters of the Hebrew alphabet, in a manner similar to that used in Rome and other ancient civilizations; the two Hebrew letter-numbers signifying “18” spell the Hebrew word for “life”, “chai”).
Moreover, contribution in kind — the giving of goods or performances of services for which the synagogue would otherwise have been obliged to pay — satisfies the statutory requirement, provided that the contribution advances the functioning of the synagogue qua a synagogue. Thus, while the catering of a party or other purely social gathering is not such a contribution, the provision of a kiddush is. “Kiddush” (literally “sanctification”), a ceremony of thanksgiving for material sustenance, involves the blessing of wine and food following the service on the Sabbath and festivals. Since it requires wine and food, and by custom, having taken on the attributes of a reception or, often, a festive meal, it performs a communal social function, rather than solely a ritualistic one. It is neither practical nor appropriate to attempt to differentiate the social from the purely ceremonial aspects of the kiddush; simply put, the custom exemplifies the traditional role of the synagogue as a communal center for prayer, study and fellowship. Similarly, the decoration of the sanctuary with fresh flowers or seasonal fruits on the various holy days is mandated by tradi *919 tian and performs a symbolic, rather than merely a nonreligious aesthetic function. Certainly the cleaning and repair of ritual objects and prayer books, such as performed by certain plaintiffs, promotes the maintenance of a functioning religious institution as much as painting and plastering.
CONCLUSION
The court therefore concludes that the sale of the synagogue was not in conformance with statute. Plaintiffs have proved that no valid congregational meeting was called or conducted to authorize the sale under the standards of section 195 of the Religious Corporations Law. Absent such authorization, the individual defendants lacked authority to sell. It is of no avail that they were cloaked with the apparent authority lent by the ex parte order which they themselves obtained. Even against an innocent purchaser as here such apparent authority cannot be held to bind a principal to acts beyond the authority of its agents and fiduciaries. (Bank of Manhattan Trust Co. v 2166 Broadway Corp., 142 Misc 910, affd 236 App Div 781.)
Nevertheless, the court should not automatically set aside the sale, however defective and unenforceable. A religious corporation is an artificial construction of the State, designed to provide the congregants with an orderly procedural framework so as to ultimately permit them to freely exercise their religion. The property of a religious corporation can be analogized to a trust fund, to be used for religious purposes. (See Kittinger v Churchill Evangelistic Assn., 161 Misc 3, 17, affd 249 App Div 703, supra.) The congregational officers (trenchantly denominated “trustees”) are fiduciaries, who must manage and preserve the property for the benefit of its religious purpose. The ultimate question of what is to be done with the property must rest with the congregation.
The evidence developed at trial does not auger well for the continued survival of the congregation as either a viable, functioning religious organization, or even as one only able to continue to maintain a building. The deteriorated building indubitably requires extensive, costly repairs. Its de *920 terioration has noticeably worsened during litigation. Given the congregation’s precarious balance sheet, it is questionable whether it would be able to repair the building and continue to bear the ever-increasing costs of maintenance, heat and light. If the court were to simply set aside the sale, the congregation would, for a second time, be deprived of the opportunity of deciding its future. The plaintiffs would have won but a Pyrrhic victory. After assessing its chances of survival, those entitled to speak for the congregation (see “standing”, supra) may well decide that sale of the synagogue is their only practical option, emotionally unpleasant as it may be. Passage of additional time may render continued use of the synagogue impossible, because of destruction through vandalism or neglect; continued population shifts and the inexorable aging process may well remove the remaining congregants, necessitating abandonment. Within the past two decades a like fate has befallen dozens of once thriving synagogues on the Lower East Side. This is a question which the congregation must answer for itself; since there are remaining congregants qualified to vote, the court need not decide the issue by invocation of the cy pres doctrine. It is evident however, that the proceeds of the sale should not be used for the benefit of the Acacia Cemetery Association. Not only is Acacia a separate and independent corporation with other beneficiaries on seven eighths of its property, such use is not a religious use. Neither should such proceeds, while held in escrow, have been commingled with Acacia funds, even if that permitted the receiving of a higher interest rate.
The congregation must be given an opportunity to review the proposed sale at a duly called congregational meeting under the standards of the Religious Corporations Law previously discussed, and, if so advised, it may ratify the sale. It should then also determine what is to become of the congregation’s Torah scrolls, ritual objects, books and other personalty, and the proceeds of any sale, subject to court approval. The order to be settled herein should fix, in addition to the foregoing, the persons to whom and the dates upon which the statutory notice is to be given and the meeting held. If the parties are unable to agree on the qualification of voters among themselves, testimony may be taken. *921 For purposes of interpreting “stated attendance” and “regular contribution” under section 195 of the Religious Corporations Law, the year preceding the meeting shall be deemed to be the year August 28, 1978 through August 28, 1979. Such congregational meeting shall have all other powers, including election of officers, permitted by law.
The proceeds now being held in escrow shall be segregated, and shall continue to be held in escrow, to await the further order of the court.
The status quo shall otherwise remain in effect until further order of this court.
Pending the congregational meeting and further order, determination of the motion to set aside the deed is held in abeyance.

. Edited for publication. Complete opinion filed under Index No. 17091/79.