In the Matter of JOYCE K. McGUINNESS et al., Appellants, against CARMINE G. DESAPIO, as Chairman of the County Committee of the Democratic Party of the County of New York, et al., Respondents.

First Department, October 15, 1959.

*Bernard Klieger* and *Stanley Geller* for appellants.

*Abraham J. Gellinoff* of counsel (*Maurice N. Nessen* with him on the brief), for Abraham S. Robinson and others, respondents.

*Albert Cooper* of counsel for the Board of Elections in the City of New York, respondent.

BOTEIN, P. J. Petitioners, defeated candidates for the positions of members of the Democratic County Committee representing the 33d Election District of the First Assembly District, New York County, appeal from the denial of their application by Special Term for a new primary election in that district.

Regular primary elections were held on September 15, 1959 for the purpose of nominating candidates for various public offices, and for electing persons to fill certain party positions. In the First Assembly District there were no primary contests for positions in the Republican party and so paper ballots were used in that party's balloting. There was a spirited contest for the Democratic party positions, and for the first time voting machines were used to record the choices of the enrolled Democrats. (Election Law, § 242-a.)

In the 33d Election District two factions were contending for three seats in the Democratic County Committee—the only offices with which we are concerned. The candidates of one faction, which shall sometimes be called the DeSapio group, were the respondents Carmine G. DeSapio, Abraham S. Robinson and Lorraine Colville. The candidates of the other faction, the McGuinness group, were the petitioners Joyce K. McGuinness, Shepard Strum and Julius C. Edelstein.

To place this contest in perspective, it should be noted that respondent DeSapio was the district leader of a portion of the First Assembly District embracing a number of election districts, including the 33d; and he was also New York County Democratic Leader and Chairman of the County Committee. The usual election excitement was intensified in the 33d Election District, where DeSapio was not only running for district leader, but also for Democratic County Committeeman. Petitioner McGuinness's husband was opposing DeSapio for the position of district leader and this was one of many contests initiated to oust district leaders supporting DeSapio and thereby bring about his removal as county leader. It should be borne in mind, however, that involved in this proceeding are only the three afore-mentioned seats out of more than three thousand on the Democratic County Committee in New York County. The fact that DeSapio was one of the candidates evidently carried implications extending well beyond the 33d Election District.*

---

* For example, section 15 of the Election Law which permits the direct election of district leaders instead of the indirect election by county committeemen, provides, in part: " Assembly district leaders and associate assembly district leaders shall not be members or vote in meetings of the county committee or any sub-committee thereof unless also duly elected to membership thereon."

The polling place for the election district was a small upholstery shop. As previously mentioned, a voting machine was provided for the Democratic primary election.

At the close of the voting, the results were tallied as follows:

| Candidates | Votes |
|------------|-------|
| Robinson | 102 |
| DeSapio | 98 |
| Colville | 97 |
| McGuinness | 97 |
| Edelstein | 96 |
| Strum | 92 |

Petitioners challenged the result, and brought this summary proceeding under subdivision 2 of section 330 of the Election Law for a new primary election, to be confined to the 33d Election District, on the ground that such irregularities had occurred that it was impossible to make a determination as to who was rightfully elected from that district to the Democratic County Committee. After reading the affidavits submitted by both sides and taking testimony at a hearing, Special Term dismissed the petition upon the law and the facts.

Subdivision 2 of section 330 of the Election Law, insofar as pertinent, reads as follows:

'' The supreme court is vested with jurisdiction to summarily determine any question of law or fact arising as to any of the subjects set forth in this section, which shall be construed liberally. Such proceedings may be instituted as a matter of right and the supreme court shall make such order as justice may require.

\* \* \*

'' 2. The nomination of any candidate, or his election to any party position, in a proceeding instituted by any candidate aggrieved \* \* \* and the court may direct \* \* \* the holding of a new primary election where \* \* \* a primary election has been characterized by such frauds or irregularities as to render impossible a determination as to who rightfully was nominated or elected ''.

Respondents have taken pains to point out that the practical effect of the relief sought by petitioners is questionable, since respondent DeSapio, who is evidently petitioners' main target, can be designated by the entire County Committee to fill a vacancy; and it is undisputed that two thirds of that committee are his adherents. This form of political calculus, however, cannot be dispositive of the instant proceeding.

Two of the alleged irregularities could not have rendered the actual results of the voting impossible of determination. The only ground which warrants serious consideration is whether, in view of the closeness of the vote, the conceded participation in the Democratic primary of two Republican voters necessitates a new election.

The facts are not substantially in dispute. About 20 minutes before the polls opened at 3:00 P.M. two women appeared at the polling place in the upholstery shop, and took up their positions at the head of the line. Just as the polls were about to open, the leadership candidates DeSapio and McGuiness appeared with their families. A large number of photographers, reporters and others surged in with them and overflowed the small shop. Some of the reporters asked the two women if they would yield their positions to the DeSapios, so that their pictures could be taken. The women, as was their prerogative, stoutly refused.

At 3:00 P.M. they signed the registration book. While general attention was focused on the voters next in line, the rival DeSapio and McGuinness families, each of the two Republican women walked into the voting booth, which was labeled "Democratic Primary", pulled the handle closing the booth curtain, and they were recorded on the public counter of the voting machine as voters numbers 1 and 2, respectively. They then walked to where Mrs. McGuinness and a poll watcher were standing, shook her hand, and, it is averred by respondents and undenied by petitioners, stated that they had done "the right thing in their favor". It was at this point that the watchers of the DeSapio group discovered that both women, although enrolled Republicans, and of course not entitled to vote in the Democratic primary, had nevertheless done so.

Neither side challenged the votes, protested the irregularity, or did anything to correct the errors—if as a practical matter anything could be done. Respondents contend that section 256 of the Election Law, which provides that voting machines may be unlocked "for good and sufficient reasons", was designed to provide for just this kind of situation. Since only these two votes had been cast when the irregularity was discovered, the machine could have been unlocked and the counters exposed, thereby disclosing whether or how the two women had voted. But it is significant that this apparently simple expedient did not suggest itself to any of the experienced watchers, nor was any proof submitted of the practical mechanics involved in opening and closing the machine.

The voting proceeded. After the district leader candidates and their retinues had departed, and the polling place had quieted

down, watchers for the McGuinness group suggested remedying the situation by eliminating one vote from the total of the candidates for each side—a suggestion the DeSapio group refused to adopt. Thereafter, nothing further was done, although there were present at the polling place on behalf of the McGuinness faction at various times during the day each of the county committee candidates, the campaign chairman and members of the legal committee.

When the machines were opened and the votes announced and recorded by the inspectors, again no objections or protest were voiced by the representatives of either faction who were present. At that time, a stipulation was signed by some of them, including Mrs. McGuinness, to the effect that the two Republican women were permitted through inadvertence and without challenge to enter the Democratic polling booth and that these voters were registered under the public counter as No. 1 and No. 2.

Respondents contend that upon this state of facts, petitioners did not sustain their burden of showing that if the two Republicans had not voted the result would have been more favorable to the McGuinness group. This is not the burden petitioners seeking a new election must bear. True, a new election will not be ordered when it is evident that none of the claimed irregularities would affect the result; or, in other words, when the proof demonstrates that the candidate challenged, despite the claimed irregularities, has in fact received a plurality of the votes cast (*Matter of Creedon,* 264 N. Y. 40; *Matter of Schurman* v. *Goldstein,* 257 App. Div. 623; *Matter of Sullivan* v. *Flaherty,* 262 App. Div. 694). But such holdings, dictated by the hard practicality that underlies most election decisions, cannot be tortured into casting an affirmative obligation upon a petitioner to prove specifically that but for the alleged irregularities a different result would have followed. If the petitioners in this or any analogous proceeding were able to establish for whom the illegal votes were cast there would never be need for the court to exercise its power to order a new primary election. The court could determine within the ambit of the judicial proceeding who had been rightfully elected. It is obvious the Legislature never intended to tax a petitioner with what in most cases would be an impossible burden of proof.

In relation to an application for a recanvass of votes cast in a primary election, it has been held that the petitioner satisfied his burden of proof sufficiently to invoke this power when he established "the *prima facie* showing of irregularities, whether innocent or not * * * [and] the closeness of the vote" (*Matter of Kelly* v. *Cohen,* 255 App. Div. 787).

The burden imposed by the statute will be satisfied in this proceeding by a showing (1) that there has been an irregularity, (2) that the result *could* have been affected thereby, and (3) that because of the irregularity it is impossible to determine one way or the other who rightfully were elected. The statute does not impose upon petitioners the burden of proving how the women voted — proof, of course, that would be antithetical to showing that it was impossible to determine who were elected. A showing of the possibility of a changed result is enough, for the section is designed " to cancel unlawful proceedings which have resulted or may have resulted in the declaration of a false result " (*Matter of Coughlin*, 137 App. Div. 283, 285, affd. 198 N. Y. 613; cf. *Matter of Crawford* v. *Cohen*, 291 N. Y. 98). Since no procedure is provided, as is the case with paper ballots, for segregating protested ballots (Election Law, §§ 213, 219) or withdrawing excess ballots by lot (Election Law, § 208), petitioners urge that only a new election can determine how the majority of enrolled Democrats in fact voted.

Respondents further contend that even if petitioners' burden is limited as above stated, they were required to produce evidence within their control that would bear upon whether the questioned votes would have changed the results. While they do not charge petitioners with any fraud or collusion in connection with the illegal actions of the two Republicans, they do assert that these women were either under their control or available to furnish affidavits or testify at the hearing. In fact, petitioners had one of the women appear in court, where she sat during the hearing, but out of professed solicitude for the secrecy of her vote they did not call her to the stand.

Petitioners could have called the two Republican women, asked them if and how they had voted, and their answers would have been admissible, for they were not in fact qualified voters (*People ex rel. Smith* v. *Pease*, 27 N. Y. 45; *People ex rel. Deister* v. *Wintermute*, 194 N. Y. 99, 104–105). Any privilege that could have been asserted was personal, and could be asserted by these women only when questioned. Absent that, there was no way of telling whether they pulled down any levers at all, whether they voted only for district leaders, only for county committee, or both, or for whom they voted.

We do not believe that petitioners failed to sustain the statutory burden simply because they failed to make any effort to prove how the two Republicans voted, if they did vote. Respondents likewise made no effort to question them.

A majority of the court is of the opinion that the record compels the finding that two Republican women did in fact vote against the DeSapio slate and for the McGuinness slate, so that the result would not be changed in any event. Concededly, there was no direct testimony as to how these women voted. This finding is based upon the undenied sequence of events evidencing the sympathy of these two women for the McGuinness group and that group's evident assumption that the votes had been cast in their favor. There were the refusal by the two Republicans to give their places in line to the DeSapio family, their statement to Mrs. McGuinness that they had done the right thing by her faction, the offer by the McGuinness' watchers to split the two votes and the failure to object or protest at any time. At the least, the majority is certain that the two Republicans did not vote for the DeSapio candidates; and to change the results one of them would have had to vote for his slate.

Such a finding destroys two requisites of petitioners' proof — that the illegal votes could change the results of the election and that it is impossible to determine who was rightfully elected — and dictates an affirmance of the order appealed from. Not all of us vote for affirmance upon this ground, even though there is support in the record for such a finding, and even though it does not appear probable on the face of the record that the two Republicans voted for the DeSapio faction.*

We are unanimous in affirming Special Term upon a second and different ground, which is not based on the state of mind of the two Republicans, but on the state of mind of the petitioners. We are persuaded that, secure in the belief that the two women had voted for their slate, petitioners deliberately chose to waive any protest of the results of the election.

There is a surprising dearth of judicial opinion on the question as to whether contestants in an election, or their representa-

---

* As a matter of law I cannot quite join in the majority finding as to how these two women voted, or that it is possible to determine who was rightfully elected. While the statements they made to Mrs. McGuinness undoubtedly will support an inference as to their state of mind immediately after they left the voting booth, one hesitates to vault from that to another inference as to whether or how they had actually voted. There must be a judicial reluctance to reconstruct what took place in the privacy of the polling place on evidence that might well suffice as proof in other frames of litigation (*Matter of Carson,* 164 Misc. 945 [BERGAN, J.], affd. 254 App. Div. 801). Courts should be especially loath to base their determination as to how a vote was cast on extraneous or subjective considerations of motive, background or probable state of mind (*Matter of Hogan* v. *Supreme Court of New York,* 281 N. Y. 572). Compare *Matter of Creedon* (264 N. Y. 40, *supra*) in which the court barred sheer conjecture but drew inferences as to how the votes were cast from analysis of the actual votes recorded on the machine.

tives, can by their conduct waive illegalities and irregularities which may frustrate the will of the people expressed in a free election. (Cf. *Briggs* v. *Gautier,* 195 Miss. 472.) Nevertheless, despite the public interest involved, the Legislature has provided us with several indicia that primary elections, and even general elections, are regarded basically as adversary proceedings largely under the control of the contestants. Thus, the bringing of summary proceedings under subdivision 2 of section 330 of the Election Law is restricted only to "any candidate aggrieved" or to the chairman of a party committee. The Supreme Court is not endowed with any inherent power in election cases and only has such power as is given it by statute (*Matter of Hogan* v. *Supreme Court of New York,* 281 N. Y. 572, *supra; Matter of Holley* [*Rittenberg*], 268 N. Y. 484; *Matter of Tamney* v. *Atkins,* 209 N. Y. 202; *Matter of Oliver,* 234 App. Div. 170). Therefore, it could only entertain a proceeding for a new primary election when brought on by an aggrieved candidate. If the McGuinness candidates had not seen fit to institute this proceeding, no one else could have done so. When the Legislature intended to give others than candidates the right to proceed pursuant to section 330, it made explicit provision, as in subdivision 5 of that section, relating to the right of any voter to bring a proceeding relating to canvasses of election returns.

Similarly, in other areas, and often through statutory provision, the voting public is bound by the action or inaction of the contestants or their representatives — in failing to make timely protest as to irregularities in absentee ballots (*Matter of Cosgrove* [*Walsh*], 292 N. Y. 115; *Matter of Commerdinger* v. *Vincent,* 270 N. Y. 657; *Sheils* v. *Flynn,* 252 App. Div. 238); in not objecting to the failure of voters to sign the registration book (*Matter of Moritt* v. *Cohen,* 255 App. Div. 804); in not protesting improper counting procedure (*People ex rel. Brown* v. *Freisch,* 215 N. Y. 356); or failure to seal the ballot box (*Matter of Norton,* 152 App. Div. 628); and even in allowing unqualified persons to vote illegally (*Matter of Macy* v. *Clayton,* 277 App. Div. 1131). In practice, it is the rare exception when anyone other than a candidate or party representative has the resources, incentive, initiative and endurance to contest any of the elective processes. So it may be that the Legislature, with a well-grounded sense of reality, found that the public interest is most effectively served by leaving certain areas of election contests to the parties who are most vitally interested — particularly those areas which by their very nature and because of the conflicting self-interests of rival candidates hold out minimal danger to the voting rights of the public.

The courts, even where finding claimed irregularities were *de minimis* or did not affect the result, have had occasion to advert to the conduct of contestants as acquiescence in and waiver of the alleged illegality. Thus, this court, in a proceeding in which the DeSapio group were insurgents in the same assembly district some years earlier (*Matter of Sullivan* v. *Flaherty*, 262 App. Div. 694, 697), commented on the complaint of improper methods of counting adopted by the inspectors on primary day with these words: " From the evidence it is apparent that the procedure employed was acquiesced in by the authorized watchers for the DeSapio group ". Where available objections are not pressed, even in the absence of statutory requirements for timely objection, and it appears that parties are prepared to abide by the results, subsequent resort to such objections by the defeated faction are not looked upon with favor (*Bramley* v. *Miller*, 270 N. Y. 307, 312).

It follows that the statute having conferred solely upon aggrieved candidates the right to call for a new election, petitioners had the power, by their acquiescence, to waive such right.

Having decided that petitioners had the power to waive the irregularities, we find that they did in fact waive them. Petitioners, their legal advisors and representatives, were present at the polls. Even though they may have failed through their negligence to observe and challenge the Republican women before they entered the Democratic voting booth, once they became aware of that fact they made no protest or complaint, and did not question the two votes any further. They offered to divide the votes and subtract one vote from the total for each side, thereby indicating a willingness to forget the entire incident; respondents rejected the offer. Even when the tally was taken, no protest was made by petitioners, and it was only upon the insistance of respondents after the closing of the polls that the stipulation was drawn and signed to be filed with the Board of Elections, setting forth the undisputed facts about the Republican voters entering the Democratic voting booth. One wonders whether petitioners would have remained so unprotesting and satisfied with the situation if the two Republican women voters had assured the DeSapio forces they " had done the right thing in their favor ".

Accordingly, a majority votes to affirm on the ground that the evidence conclusively establishes that the two Republican women voted for the McGuinness slate, so that the results of the election could not have been changed by eliminating their votes, and it is possible to determine that Robinson, DeSapio and **Colville** were rightfully elected.

We unanimously vote to affirm on the ground that petitioners by their conduct and course of acquiescence waived their right to question the two votes in issue.

The order should be unanimously affirmed, on the facts and the law, without costs.

M. M. FRANK, VALENTE, MCNALLY and STEVENS, JJ., concur.

Order unanimously affirmed on the facts and on the law, without costs.