RECTOR, CHURCH WARDENS AND VESTRYMEN OF ST. BAR-THOLOMEW'S CHURCH IN THE CITY OF NEW YORK, Respondent, v COMMITTEE TO PRESERVE ST. BARTHOLO-MEW'S CHURCH, INC., et al., Appellants.

First Department, March 11, 1982

APPEARANCES OF COUNSEL

*Gerald D. Fischer* of counsel (*Lefrak Fischer & Myerson,* attorneys), for appellants.

*Paul Windels, Jr.,* of counsel (*Kenneth W. Greenawalt, Raymond T. Munsell* and *Todd B. Sollis* with him on the brief; *Windels, Marx, Davies & Ives,* attorneys), for respondents.

**OPINION OF THE COURT**

ASCH, J.

This case involves the proposal to sell a portion of the realty of St. Bartholomew's Church in the City of New York for the construction of a high-rise office building. On this appeal, the appellant committee *et al.* seek to impugn the election by which the church membership approved the plan.

Subdivision 6 of section 43 of the Religious Corporations Law sets forth certain voter qualifications as follows: "6. Persons of full age belonging to the parish, who have been baptized and are regular attendants at its worship and contributors to its support for at least twelve months prior to such election or special meeting or since the establishment of such parish, shall be qualified voters at any such election or special meeting. Whenever so permitted by the canons of the diocese, persons of less than full age, but of the age of eighteen years or more, and having like qualifications except as to age, may vote at the annual elections and special meetings of any parish of such diocese, whenever such parish shall so determine in the manner provided in said section forty-six."

A conference was held in the chambers of Justice GREENFIELD, before whom the matter was pending. The voting procedures were discussed and agreed upon. Among other things, it was agreed that the court would interpret subdivision 6 of section 43 of the Religious Corporations Law with respect to the qualification of such parishioners who would be allowed to vote, and that the court would supervise the actual vote.

In addition to counsel for the respective sides, Mr. Armstrong, for the defendants, and Reverend Bowers, the rector, were present at this conference. After oral argument, upon the stipulation of all parties and counsel, the court stated, *inter alia,* as follows:

"First, all parties agreed that the ruling that the court makes with respect to clarifications for voting will apply equally to the proposed membership meeting on the 1982 lease of church property and the Article 78 proceeding with respect to election of vestrymen in 1981. The court rules after having examined this section and comparing it to other language of the Religious Corporations Law, that the provision which limits voting to contributors of record for at least 12 months prior to the annual or special meeting sets the minimum limitation so that voters cannot appear for the first time and make a contribution during a current year which would entitle them to vote. The court rules, however, that there is nothing in the language of the statute or by-laws which necessitates contributors doing so

in successive years. There is nothing in the by-laws which requires that a contributor shall have contributed in the next preceding year (which is the language of §195 RCL, *Kroth* v. *Congregation,* 430 N.Y.S. 786, 793). As a practical matter however, the court rules that there has to be some exhibition of current interest as indicated by the requirement that they belong to the parish and be regular attendants.

"Accordingly, the court concludes that any person who has been a contributor of record at some point more than 12 months prior to the annual meeting and who makes a contribution to the support of the church during the current year, shall qualify to vote at the annual or special meeting. In other words, anyone who has made a contribution in the years 1979 or 1980 and makes a further contribution in the year 1981 shall be deemed a qualified voter."

It seems noteworthy that in addition to the substance of Justice GREENFIELD's ruling regarding parishioner voting qualifications, the parties expressly stipulated that the court ruling would "dispose of the issues pertaining to the Church election matters."

Special Term should be affirmed, even if Justice GREENFIELD erred in his construction of who was entitled to vote, simply because the defendants, as a result of their role in what transpired, cannot be heard to complain about the outcome of the vote. Justice GREENFIELD responded to a request for assistance from both parties. Certainly, defendants' counsel never objected to the Justice's assertion of authority to formulate the rules and supervise the election. After Justice GREENFIELD's rulings, the defendant committee sent out a letter dated November 27, 1981, confirming the stipulation reached before the court, detailing the eligibility standards set for voters at the court conference and urging parishioners to vote against the proposal. Both factions did more than simply acquiesce. They actually participated in the formulation of the rules propounded by the court and then, those they represented voted in the election. It comes with ill grace for a faction which had accepted the terms of the election to stand by, await the outcome, and upon dissatisfaction with the result of the election, complain.

The reliance by appellants upon such cases as *Matter of McGuinness v DeSapio* (9 AD2d 65) and *Bramley v Miller* (270 NY 307) is misplaced. Those cases reaffirm the right of suffrage in public matters. No one can quarrel with the proposition that citizens should not be deprived of their votes in matters of public concern. It seems significant even in general elections, that the Court of Appeals has been ready to forgive "minor irregularities or irregularities and improprieties acquiesced in or ratified in some manner, not effecting the deprivation of the opportunity to vote".

In any event, as compared with the elections dealt with in *Matter of McGuinness* and *Bramley* (*supra*), the special election of St. Bartholomew was a private concern of the church, to be decided internally. Municipal elections are quite different from the conduct of an ecclesiastic body. It is no coincidence that from the earliest confrontation between church and secular authorities, even preceding the emergence of the principle in English common law, church affairs have been separated from secular dictation. (See Goebel, Cases and Materials on the Development of Legal Institutions [1946], passim, pp 347-352, 354-360.) From the beginning, American legal authority has supported the idea that church matters be left to the church itself. (See, e.g., *Bouldin v Alexander,* 15 Wall [82 US] 131.) As Justice Hugo L. Black stated in *Everson v Board of Educ.* (330 US 1, 16): "Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa*". (See, also, *McCollum v Board of Educ.,* 333 US 203.)

The law of New York affirms the principle that the presiding officer at a special meeting of the parish shall be the ultimate judge of its elections. Thus, subdivision 5 of section 43 provides: "5. The presiding officer of such annual or special meeting shall be the rector of the parish, if there be one, or if there be none, or he be absent, one of the church wardens elected for the purpose by a majority of the duly qualified voters present, or if no church warden be present, a vestryman elected in like manner. *Such presiding officer shall be the judge of the qualifications of the voters;* shall receive the votes cast; and shall declare the

result of the votes cast. The presiding officer of such annual or special meeting shall enter the proceedings of the meeting in the book of the minutes of the vestry, sign his name thereto, and offer the same to as many qualified voters present as he shall think fit, to be also signed by them." (Emphasis added.)

An opinion of the Attorney-General states: "The presiding officer of the meeting (the rector), is the judge of the qualifications of voters and he should use his judgment and discretion as to whether an individual is qualified to vote". (1933 Atty Gen [Inf Opns] 583; see, also, *Matter of Williams*, 57 Misc 327; *Matter of Anthony v Cardin*, 91 Misc 2d 506; *Rector, Church Wardens & Vestrymen of Church of Holy Trinity v Manufacturers Trust Co.*, 18 Misc 2d 761, affd 9 AD2d 932, mot for lv to app den 10 AD2d 628.)

We reiterate that the plaintiff rector (and the defendants) sought the assistance of Justice GREENFIELD in setting common grounds for determining the qualifications of individual voters and the election was conducted under the aegis of the rector (hearing of Dec. 16, 1981, p 103).

The major reliance of the dissent is that Special Term was mistaken in its reading of subdivision 6 of section 43 of the Religious Corporations Law. Whether its construction was correct or not is by no means critical. Perhaps Justice GREENFIELD did not follow the language of the statute literally but it is clear that he endeavored to carry out its purposes.

With respect to the voter qualification issue, appellants contend that the court below improperly construed the section by limiting qualified voters to those church members who contributed in 1979 or 1980 (as well as 1981), although the statute does not set forth any limitation. As appellants would have it, a member who contributed in 1981 and at a time earlier than 1979 (e.g., 1977 or 1978) is qualified under the statute. Accordingly, it is urged that a substantial number of church members were improperly disenfranchised from voting, and had they been allowed to vote, the outcome well could have been different.

Given the statutory language of "Persons * * * who have been * * * contributors to its support for at least

twelve months prior to such election", and in keeping with the obvious legislative intent that there must be a "current" showing of church support for a member to qualify, Justice GREENFIELD gave a practical construction to the statute. The statute reads "at least twelve months *prior* to such election". (Emphasis added.) Thus, it is only those parishioners who have contributed during the 12 months prior who can vote under the terms of the section. The court below calculated correctly, at least in part, since the election was held on December 18, 1981 and "twelve months prior to such election" would be some time in December, 1980.

A parishioner who contributed only commencing in 1981 would *not* be eligible under the statutory language. Special Term, by interpreting the section to include "anyone who has made a contribution in the years 1979 or 1980 and makes a further contribution in the year 1981 shall be deemed a qualified voter" may have actually enlarged the franchise.

Indeed, if this statute is to be read as requiring current support in 1981, under *Kroth v Congregation Chebra Ukadisha Bnai Israel Mikalwarie* (105 Misc 2d 904), the Religious Corporations Law imposes only minimum requirements for the voter qualification, and therefore it was reasonable and not violative of this section to mandate, with the consent of the competing factions, additional requirements of a contribution in 1979 or 1980. This construction of the statute establishing minimum voter qualifications, protects the voting rights of parishioners while preserving church affairs from secular domination.

Certainly, the construction that isolated contributions made "ad infinitum" before 1979, in addition to a 1981 contribution, would still qualify a member for voting is neither a reasonable nor practical construction of the statute, nor one in keeping with the legislative intent.

It may well be that the public has a stake in the architecture or the use to which the physical property of St. Bartholomew's should be put. In so noting, we do not express an opinion with respect to that question. In that case, however, the appropriate mechanism for regulating

this use would seem to be the zoning board or the Landmark Commission, not by judicial interference with the affairs of church management.

While in our opinion, those presently before the court were not the persons who may legitimately complain about disenfranchisement, it is not our intention to preclude other parishioners, if any, who were not represented below from asserting their right to vote. If any such parishioners deem themselves improperly deprived of their rights, they can now so move to set the election aside on their own behalf and on behalf of those others similarly situated.

Appellants also appeal from the order dated December 16, 1981, entered January 5, 1982, denying the motion to enjoin the December 18, 1981 vote, upon the grounds that the committee was denied access to the relevant church membership and contribution lists for the relevant years (1979 through 1981) and thus was denied an opportunity to determine or challenge the qualifications of those members who were to vote or in fact voted.

It appears that contrary to appellants' contentions, they were given ample opportunity to ascertain the qualified voters from membership lists and to make challenges where deemed appropriate. We further note that this election was closely supervised by the court to assure its regularity.

The respondent rector *et al.*, have complained that this court lacks jurisdiction to hear this appeal because the orders appealed from were defective and not properly or timely entered when notices of appeal were filed. However, the order dated November 24, 1981 was entered December 23, 1981 and the order dated December 16, 1981 was entered January 5, 1982 and notices of appeal were appropriately amended to reflect said entries. (See CPLR 2001.)

Accordingly, the orders of the Supreme Court, New York County (GREENFIELD, J.), entered December 23, 1981 and January 5, 1982, which, respectively, set forth qualifications of parishioners who voted at the special election on the approval of the sale of church property, and, which denied the defendants-appellants' application to enjoin the special election of December 18, 1981, should be affirmed, without costs or disbursements.

LUPIANO, J. (dissenting). Subdivision 6 of section 43 of the Religious Corporations Law provides, in pertinent part, that "[p]ersons of full age belonging to the parish, who have been baptized and are regular attendants at its worship and contributors to its support for at least twelve months prior to such election or special meeting * * * *shall be* qualified voters at any such election or special meeting" (emphasis supplied). Under this statute and its predecessor provisions, it has been held that, in order to qualify to vote, a person must be (1) a regular attendant at the parish's worship for one year prior to the election, and (2) a contributor to the parish's support for one year prior to the election (see *People ex rel. Osborn v Tuthill* (31 NY 550; *Smith v Bowers,* 57 App Div 252; *Matter of Anthony v Cardin,* 91 Misc 2d 506; 1902 Report of Atty Gen 347). The statute is clear and unambiguous. However, Special Term, in construing the statute, *added* further requirements to the statutory qualifications, to the effect that a person must also have made a contribution in a period next preceding the "twelve months prior to such election" to wit, in the period commencing January 1, 1979, and ending 12 months prior to the election. Simply stated, the 12-month period prior to the election, which was held on December 18, 1981, embraces the year 1981. Special Term ruled that a person to be qualified to vote must have made a contribution in 1981, but, in addition, must also have made a contribution in 1979 *or* 1980.

Under this ruling, any person otherwise qualified to vote under the statute who failed to make a contribution in either of the two years next preceding the year prior to the election was disenfranchised. In other words, a person qualified to vote under subdivision 6 of section 43 of the Religious Corporations Law because he or she was a regular attendant at parish worship and contributor to the parish for the year prior to the election (to wit, 1981), could not vote unless he or she was also a contributor prior thereto for an arbitrarily selected period. Thus, a person otherwise qualified to vote who contributed only in 1981, or a person who contributed in 1981 and in a prior year or years other than either 1979 or 1980, was not qualified to vote.

The statute specifies who may vote, and in respect of persons less than full age but of the age of 18 years or more permits changing the qualifications of voters to allow such persons to vote pursuant to section 46 of the Religious Corporations Law (see 49 NY Jur, Religious Societies, § 93). It is concluded, therefore, that the requirements of section 43 of the Religious Corporations Law sets forth the qualification of voters. Those entitled to vote in accordance with these statutory requirements may not be disenfranchised. Any other result is at variance with the statutory scheme envisioned by sections 43 and 46.

In the Report of the Attorney-General issued in 1902 (p 348) on the issue of who is qualified to vote, it was recognized that *People ex rel. Osborn v Tuthill* (*supra*) "exhaustively considered these questions." Regular attendance for the period of one year (12 months) prior to the election and contribution therein "of a vital and substantial character" was deemed sufficient qualification to vote. Special Term issued its ruling on qualifications to vote pursuant to, in its words, "the stipulation of all parties and counsel that the ruling of this court would dispose of the issues pertaining to church election matters". The critical issue thus becomes whether the parties to this action can stipulate to voter qualifications which add to the requirements of the statute so as to frustrate those, otherwise entitled under the statute to vote, from exercising their right to vote, i.e., whether the parties may stipulate to disenfranchise any otherwise qualified voters. While in other areas the voting class may be bound by the action of the contestants or their representatives — such as failing to make timely protest as to irregularities in absentee ballots, in not objecting to the failure of voters to sign the registration book, in not protesting improper counting practice or failure to seal the ballot box, in allowing unqualified persons to vote illegally and in failing to protest irregularities, thereby appearing as being prepared to abide by the results (see *Matter of McGuinness v DeSapio,* 9 AD2d 65, 73-74) — the instant matter presents an entirely different issue, to wit, the disenfranchisement of members of an electorate entitled to vote, i.e., depriving them of the opportunity to vote.

Indeed, in *Bramley v Miller* (270 NY 307, 313) the Court of Appeals specifically noted that "[t]he result of this election [to determine establishment of a central school] is sought to be set aside, not because * * * the electors had no opportunity to vote, but solely because the call for the meeting may have lacked one signature * * * Conceding that * * * the electors have had the notice required by law; and that they have participated without hindrance so that the election is a fair and properly conducted election, all minor irregularities and defects in working the machinery or procedure whereby the election is brought about are insufficient to avoid the result." Disenfranchisement of part of the electors goes to the heart of the elective process itself. Accordingly, the Court of Appeals aptly distinguished between minor irregularities or irregularities and improprieties acquiesced in or ratified in some manner, not effecting the deprivation of the opportunity to vote, and such irregularity and impropriety which hinders those qualified to vote in the exercise of that prerogative or deprives them of the right altogether.

It is well recognized that "[t]he disenfranchisement of innocent voters by the mistake or even the wrongful misconduct of election officers in performing the duties cast upon them will not be permitted" (18 NY Jur [rev ed], Elections, § 156). Similarly, Special Term was entrusted with supervision of the election in determining who was qualified to vote, i.e., in carrying out the statutory mandate of section 43 of the Religious Corporations Law. Its mistake in construing the statute so as to disfranchise any of those who, under the clear mandate of the statute, were entitled to vote, may not be permitted.

Plaintiff's argument that the stipulation entered into between the parties that Special Term would dispose of the issues pertaining to church election matters constitutes a waiver of appellate review and insulates any error by Special Term, no matter how egregious, from further judicial oversight is not well taken. As already indicated, we have an issue presented that goes to the heart of the elective process — the disfranchisement of voters. The public policy considerations which emanate from such issue are interwoven with the policy considerations underly-

ing the necessity of affording to the litigants some form of appellate review. In *Matter of Washington Ave. Baptist Church* (215 App Div 529), it was held that the court has no authority under section 32 of the General Corporation Law to determine in advance of an annual election of a religious corporation who are qualified to vote thereat and to supervise the proceedings at the election to the end that all qualified members may vote, and that the limit of the court's authority is to pass upon an election that has been held and to confirm it or to order a new election. Thus, the stipulation between the parties conveyed on Special Term the authority, the jurisdiction to determine the qualification of voters at an election to be held and to supervise the election to the end that all qualified members may vote, neither more nor less. Indeed, plaintiff's counsel acknowledged such to be the fact in stating to Special Term: "we conceded that in order to proceed with this election you would retain jurisdiction to determine the qualifications of voters." Obviously, Special Term's rulings on the qualifications of voters delivered *after* an election has been held in a review of such election to correct abuses is subject to appellate review. Similarly, the exercise of such power *before* the election pursuant to stipulation between the parties is subject to the same appellate review. Any other result is prone to mischief and should not be countenanced. Succinctly stated, the parties, while stipulating to permit Special Term to retain jurisdiction to determine the qualifications of voters, did not agree to be finally bound by Special Term's rulings, no matter how erroneous, or to waive their right to appeal such rulings.

Parenthetically, it is noted at this point that the instant appeal has not been rendered academic by virtue of this court's reversal of Special Term's grant of summary judgment to defendants on their second counterclaim; the denial by this court of defendant's motion for summary judgment on the second counterclaim and for injunctive relief and the granting of plaintiff's cross motion for summary judgment dismissing the second counterclaim (*St. Bartholomew's Church v Committee to Preserve St. Bartholomew's Church,* __ AD2d __). Plaintiff voluntarily consented to adopt the proposed by-laws amendment requiring

a membership vote before any sale or disposition of real estate was made.

At the election held on December 18, 1981, on the question of whether or not the church should enter into a certain lease transaction with respect to its real estate, the question passed by 21 votes, 375 in favor and 354 opposed. In view of the closeness of the election result, the rarity with which New York courts have been called upon to consider the formalities and elective process respecting elections taken pursuant to the Religious Corporations Law, and having due regard for the importance of this particular election to the parish and its members, reason and common sense warrant a remand for a determination as to whether the disfranchisement *actually* occurred; that is, whether it was material to the result. Simply stated, while Special Term's ruling resulted in disfranchisement in the abstract, it might well be that in actuality no one was hindered from exercising his or her franchise to vote under section 43 because he or she also qualified under the added requirement imposed by Special Term. It is not necessary to determine that the result would be different. All that is required is a showing that the result could have been affected thereby — a showing of the real possibility that the election may have produced a false result.

Clearly, the parties to this action are most vitally interested in the elective process at issue, which interests, by their very nature and conflicting aspect, assure the minimalization of danger to the voting rights of the parish members. It is this reality which conveys on the respective parties standing to advance the voting rights of the parish membership and effectively serves the public interest.

Regarding defendants' appeal from Special Term's order dated December 16, 1981 denying defendants' motion to enjoin the meeting scheduled for December 18, 1981 at which the election would take place, it appears that a reasonable adjournment should have been granted. Scrutiny of the record discloses a hotly contested issue between the parties as to whether plaintiff furnished the defendant committee with a complete current membership list and adequate information regarding contributors for the years 1979, 1980 and 1981. Indeed, it appears that a membership

list (whether complete or incomplete) was given to the committee as late as 4:00 P.M. the day before the election. Neither side disputes the principle that parish members duly qualified to vote must be accorded the widest possible participation in the elective process. A reasonable adjournment would have afforded a more settled record regarding this exchange of relevant information. The atmosphere of the proceedings before Special Term was permeated with time pressure, the parties being "under the gun" to proceed expeditiously with the election. The issue of affording defendants equal access to the parish electorate apparently suffered in some measure by this state of circumstances. However, defendants did not subsequently in the brief intervening period before the election seek leave to reargue or obtain a stay in any fashion, whether at the appellate level or at Special Term. Instead, the defendants proceeded with the election governed apparently by pragmatic considerations. Accordingly, while reversal of Special Term's refusal to grant a brief postponement of the election is warranted, a new election is not automatically mandated. Acknowledgment of the imperatives confronting the litigants and the absence of a clear showing that the democratic elective process was vitiated by the refusal, compels the conclusion that the election result stand unless the materiality of the disfranchisement occasioned by Special Term's rulings on voter qualifications is demonstrated at the hearing as above directed. Of course, assuming such materiality is shown, a new election is warranted.

While acknowledging the good faith of the parties herein, the transcript of the proceedings before Special Term unequivocally demonstrates that, depending on the election result, the "losing" side would seek a new election.

Accordingly, the order of the Supreme Court, New York County, dated November 24, 1981 and entered December 23, 1981, which sets forth the qualifications of St. Bartholomew's parishioners to vote at the special election on the approval of a certain sale of church property, should be reversed, on the law, and the matter remanded for a determination as to whether the disfranchisement was material to the result at such special election in accordance with the aforesaid. The order of said court, dated December

16, 1981, denying defendants' motion to enjoin (postpone) the meeting scheduled for December 18, 1981, should be reversed, on the law and the facts.

SANDLER, J. P., SULLIVAN and MARKEWICH, JJ., concur with ASCH, J.; LUPIANO, J., dissents in an opinion.

Orders, Supreme Court, New York County, entered on December 23, 1981 and January 5, 1982, respectively, affirmed, without costs and without disbursements.